UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re CMC Telecom, Inc.,                           Case No. 07-56001
                                                   Chapter 11
                        Debtor.                    Hon. Marci B. McIvor
_____/

## OPINION GRANTING IN PART AND DENYING IN PART OBJECTIONS TO FINAL FEE APPLICATION OF MCGUIREWOODS LLP

This matter is before the Court on the Final Application of McGuireWoods LLP for

Allowance of Compensation and Reimbursement of Expenses as Counsel to the Official

Committee of Unsecured Creditors for Services Rendered from September 19, 2007

through July 28, 2008.  McGuireWoods seeks total fees and expenses of $246,242.92

(fees of $238,859 and expenses of $7,383.92).  Debtor CMC Telecom, Inc. filed

objections to the amount of compensation requested.  Secured creditors JPMorgan

Chase Bank N.A. ("JPMorgan") and Chase Equipment Leasing ("Chase Equipment")

also filed objections to the Application.  A hearing on the Application was held on

October 28, 2008.   For the reasons stated in this Opinion, the Objections are  sustained

in part and denied in part.  Total fees and expenses are awarded in the amount of

$155,296.67.

## Background

Debtor CMC Telecom, Inc. filed a voluntary chapter 11 bankruptcy petition on

August 15, 2007.  Debtor is a competitive local exchange carrier that provides local and

long distance telephone services, as well as internet solutions, to small and medium

sized businesses.  Debtor's schedules disclosed total assets of $4,647,296 and total

liabilities of $6,630,503.    Debtor's largest creditor is AT&T.  AT&T provides Debtor with

telecommunications services; specifically, Debtor purchases telecommunication services from AT&T for resale to business customers in Indiana, Illinois, Michigan, and Wisconsin. AT&T bills Debtor for services provided to Debtor on either a per-line or usage basis. AT&T filed a secured claim in the amount of $3,808,254.58 (claim no. 29), and an unsecured claim in the amount of $70,044.77 (claim no. 14). [1] JPMorgan filed a claim in the amount of $2,019,719.33 (claim no. 44), secured by a first priority interest in all of Debtor's assets, including accounts receivable. Chase Equipment filed a claim in the amount of $431,069.28 (claim no. 45), secured by a first priority interest in certain equipment, and a disputed interest in the remaining assets. Unsecured claims totaling $614,926.28 were filed in this case.[2]

At the time the petition was filed, Debtor filed several "first day" motions, including a Motion for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members. An Order granting that Motion was entered on August 20, 2007. The Debtor also filed a Motion Authorizing the Use of Cash Collateral. On August 27, 2007, the Court entered an Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection. The Interim Order became a Final Order on September 10, 2007.

---

[1]AT&T's claim was secured only to the extent that it had set-off rights against Debtor's claims against AT&T.

[2]This number excludes unsecured claims filed by local school districts and the Universal Service Administrative Company in the amount of $126,533.49. Amounts owed to the school districts (whether filed as secured, unsecured, or priority claims) were found to be funds held in trust, and thus not property of the estate. The Universal Service Administrative Company claims were filed for the benefit of the school districts. It also does not include the potentially large deficiency on AT&T's "secured" claim.

Within six weeks of the filing of the petition, Debtor was administratively insolvent. At the date of filing, Debtor reported cash on hand in the amount of $277,000. The Monthly Operating Report for the period ending September 30, 2007 discloses cash on hand in the amount of $61,587. The Monthly Operating Report for the period ended October 31, 2007 discloses cash on hand of $12,683. The Monthly Operating Report for the period ending November 30, 2007 discloses cash on hand of $1,853. By the end of February, 2008, Debtor reported a negative cash balance of $25,460. Debtor remained administratively insolvent throughout the case.

An Unsecured Creditors' Committee (hereinafter "the Committee") was formed on September 19, 2007. Three unsecured creditors served on the Committee: (1) AT&T Wholesale, (2) Internet 123, Inc., and (3) U.S. Signal Company, LLC. On October 4, 2007, the Committee filed an Application to Employ McGuireWoods, LLP as Counsel to the Committee. Debtor filed objections to the appointment, asserting that the proposed hourly rates were excessive, and that the travel expenses related to hiring out-of-town counsel were unnecessary. At a hearing on the Application held on October 23, 2007, the Court found that Debtor's specific objections to McGuireWoods' proposed hourly rates were premature, and should be raised, if necessary, as objections to the final fee application. An Order Authorizing the Employment and Retention of McGuireWoods as Counsel to the Committee was entered on October 25, 2007 (McGuireWoodsLLC will hereinafter be referred to as "McGuireWoods" or "Counsel for the Committee").

On November 20, 2007, the Committee filed an Application to Employ Stout Risius Ross, Inc. (hereinafter "SRR") as financial advisors to the Committee. Debtor

3

and secured creditors JPMorgan and Chase Equipment filed objections to the Application. At the December 18, 2007 hearing on the Application, Counsel for the Committee expressed concern that Debtor was not moving forward with the case (by way of either a sale or a plan of reorganization) quickly enough, and that the appointment of a financial advisor was necessary for: (1) obtaining reliable financial data regarding Debtor's condition and operations, (2) evaluating the value of the company as an ongoing concern, and (3) finding a purchaser for the sale of Debtor's assets. Both Debtor's Counsel and the Court expressed serious concerns regarding Debtor's deteriorating cash position and its ability to pay the additional professional fees that would result from granting the Application. The fee structure initially proposed for SRR was $15,000 per month with a $100,000 transaction fee payable upon any sale, restructuring, reorganization or liquidation of Debtor. The proposed fee for SRR was expressly rejected by the Court as excessive in light of Debtor's financial condition. The Court stated:

> I have nothing but the highest regard for Stout Risius and Ross, but given the posture that this case is in today. . . they are subject to the exact same fee conditions as everybody else in the interim fee procedure order. They can submit a monthly application for fees, and it can be approved or disapproved in the same manner [as] other professionals. . . maybe [no one] will work for the committee without some kind of guaranteed payment because of the financial posture of this case, but. . . given that this is going to impinge on the secured creditor [and] is going to impinge on anybody else's ability to collect fees, and right now there is not enough money being generated to pay what Stout Risius and Ross believes they deserve to be compensated. . . [the fee requested] may be [SRR's] going rate, but it can't happen in this case– not now.

Hearing Transcript, December 18, 2008 at 17-18. The Court determined that SRR's hourly fees should be reviewed by the Court pursuant to the standard set forth in 11

U.S.C. § 330 of the Bankruptcy Code. On December 20, 2007, the Court entered an Order authorizing the Committee to retain SRR as a financial advisor.

Pursuant to its duties as a financial advisor, it was contemplated that SRR would conduct an extensive financial analysis of Debtor, including a valuation for purposes of marketing Debtor as a going concern. SRR was expected to provide the Unsecured Creditors' Committee with information needed for the Committee to draft a plan of reorganization, if, at some point, competing plans could be filed. While Debtor initially filed a Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement, the Committee, JPMorgan and Chase Equipment all filed objections to the Motion. The Motion was withdrawn on January 8, 2008.

On January 24, 2008, Counsel for the Committee filed its First Application for Compensation for Official Committee of Unsecured Creditors for the period of September 19, 2007 through December 31, 2007. The Application sought fees in the amount of $66,729 and expenses in the amount of $2,388.59. The blended hourly rate charged was $359.92. No objections were filed, and an Order approving the fee application was entered on February 22, 2008.[3]

On February 15, 2008, Debtor filed its Combined Plan of Reorganization and Disclosure Statement. A First Amended Plan was filed on March 11, 2008. Debtor's First Amended Plan sought to reorganize and restructure Debtor's operations (First Amended Plan ¶ 4.1). The Plan was to "be funded from the income generated by the

---

[3]According to McGuireWoods' final fee application, for the period from September 19, 2007 through July 28, 2008, the firm has received fees in the amount of $9,075.70 and expenses in the amount of $146.30.

5

Debtor and the Reorganized Debtor." (First Amended Plan ¶ 4.3). Paragraph 4.4

provided, in part,

> If necessary, the Reorganized Debtor may, in its sole discretion, seek
> equity infusions and/or to obtain refinancing from either a lending
> institution or from other sources in an effort to satisfy the necessary
> payments described in Articles II and III of this Plan. . .

Debtor's First Amended Plan did not explain how, in light of the consistent losses

generated by Debtor's operations, a reorganized debtor would generate sufficient

income to pay either secured or unsecured creditors, nor did the Plan explain who might

be willing to infuse equity or refinance the reorganized debtor's operations. With regards

to AT&T's secured claim, Debtor's Plan stated: "[t]he AT&T secured claim is disputed

and is the subject of ongoing litigation. The Debtor intends to continue the litigation to

*inter alia*, liquidate the AT&T secured claim." Debtor's Plan ¶ 3.4.1. The Debtor's First

Amended Plan proposed to treat unsecured creditors as follows:

> This class shall consist of the Allowed Unsecured Claims against the
> Debtor, including Deficiency Claims, but excluding the Claims of Mr.
> Champagne, and excluding the Claims in Class VI.[4]  Debtor estimates that
> this class is owed $643,204.00. This class is impaired.
>
> The Allowed Claims of this Class shall be paid in full in equal monthly
> installments of principal and interest commencing ninety (90) days after
> the Effective Date and continuing on the same day of each month
> thereafter for a period of five (5) years.

Debtor's First Amended Combined Plan of Reorganization and Disclosure Statement,

¶¶ 3.5, 3.5.1 (footnote added).

Objections to Debtor's First Amended Plan were filed by JPMorgan, Chase

---

[4]Class VI is a "convenience" class.

6

Equipment, AT&T[5], and the Committee.    The Committee's objections were based on

lack of feasibility (noting that Debtor had not generated a profit from operations since

2005), misclassification of claims, and failure to recognize that no plan could be

confirmed without the support of AT&T, the creditor whose claims were misclassified

under the proposed Plan.  AT&T's objections focused on, among other things, the

Plan's failure to cure $3.8 million in pre-petition defaults, failure to provide adequate

assurance of payment for future services, misclassification of its claims, inability to pay

administrative expenses at the effective date of the Plan, and inability to generate

sufficient funds to fully pay unsecured claims as promised.  The ballot summary filed by

Debtor indicated that its Plan did not have sufficient votes for confirmation.

    The Committee filed a competing Combined Plan and Disclosure Statement on

February 20, 2008, and an Amended Plan on March 11, 2008.  The Committee's Plan

sought to reorganize Debtor through the sale of its assets.  The Plan proposed the

appointment of SRR as the post-confirmation plan administrator, and provided that

"[t]he Plan Administrator shall, in an expeditious but orderly manner, liquidate and

convert the Assets and the Debtor's Causes of Action, make timely distributions, and

not unduly prolong the duration of the Bankruptcy Case".  (Committee's Amended Plan

¶ 5.2).  With respect to the sale of Debtor's Assets, the Committee's proposed Plan

provided:

> The Plan Administrator, in its sole discretion and subject to Post-
> Confirmation Committee oversight, may enter into an Asset Purchase

---

[5]AT&T was a member, at least initially, of the Unsecured Creditor's Committee
and was represented in that capacity by McGuireWoods.  AT&T was also represented
by its own counsel, Freeborn & Peters LLP, with regards to its potential secured claim.

Agreement with a prospective purchaser. Immediately after the execution of an Asset Purchase Agreement, the Plan Administrator shall file a motion with the Court to schedule a competitive auction in open court, after which the winning bidder shall purchase, pursuant to an Asset Purchase Agreement, and subject to Court approval, the Debtor's Assets free and clear of any lien, mortgage, charge, demand, encumbrance, pledge, security interest, claim or other type of third party interest. SRR and the Committee expect the closing on the sale of the Debtor's Assets to occur on or before May 13, 2008. However, if the sale of Debtor's Assets does not occur by May 13, 2008, the Plan Administrator has the right in his/her sole discretion, to (I) continue to operate the business to further pursue a going-concern transaction, (ii) conduct an orderly liquidation of the Debtor's Assets, (iii) file a motion with the Court requesting conversion of this case to a case under Chapter 7 of the Bankruptcy Code, or (iv) modify the plan in accordance with § 1127 (h) of the Bankruptcy Code, whichever is in the best interest of the Estate.

Committee's Amended Plan ¶ 5.3. The Committee's Amended Plan also proposed a surcharge of $100,000 on the collateral securing the claims of JPMorgan and Chase Equipment. The Committee's Plan stated:

Subject to the Plan Administrator's reservation of rights described in Section IV.A of the Disclosure Statement, and payment of $100,000 to fund the liquidation of Debtor's Assets and Debtor's Causes of Action, on the Effective Date JP Morgan will be (I) paid in cash equal to the interest in the property of the Estate constituting the collateral of such Class 2 Claim; or (ii) the property of the estate constituting the collateral for such Class 2 Claim shall be conveyed to the holder in full satisfaction of such claim.

Committee's Amended Plan, ¶ 3.2. The Plan did not indicate that any specific purchaser had been located, nor did it state that any letters of intent to purchase had been received.

Objections to the Committee's Plan were filed by Debtor, Debtor's Counsel, JPMorgan, and Chase Equipment. The secured creditors objected to, among other things, the surcharge on their collateral without their consent. Debtor's Objections to the Committee's Plan were similar to the objections of JPMorgan, Chase Equipment,

8

and Debtor's Counsel.  Specifically, Debtor objected to the Committee's proposal that JPMorgan pay the cost of retaining Stout Risius Ross, and argued that the Plan was not feasible in light of SRR's failure to find a purchaser for Debtor's assets.  Additionally, Debtor noted that no impaired class of creditors had voted in favor of the Committee's Plan.  The Committee did not file a ballot count summary, nor did it file a second amended plan.

The Court scheduled a hearing on confirmation of the competing plans of reorganization on May 21, 2008.  At the hearing, Debtor and the Committee both acknowledged that outstanding objections to their respective plans had not been resolved, and neither party was prepared for a contested confirmation hearing.  The Court adjourned the confirmation hearing on the competing plans.

After the May 21, 2008 hearing was adjourned, the Committee filed no additional pleadings.  The Committee did not amend its Plan or file a motion seeking authority to sell Debtor's assets.  However, Debtor and AT&T, through their lawyers, engaged in direct negotiations to resolve all litigation between the parties. The Debtor and AT&T requested several adjournments of the hearing on confirmation of the Debtor's Plan in order to continue their negotiations.

At a hearing on July 22, 2008, Debtor's Counsel stated that it had resolved all issues with AT&T, JPMorgan, Chase Equipment, and the Committee.  On July 25, 2008, Debtor filed a Second Amended Plan of Reorganization, and a "Stipulation to the Entry of Order (I) Confirming Debtor's Second Amended Plan of Reorganization and (ii) Approving Disclosure Statement.  The stipulation was signed by Craig Champagne, Debtor's principal.  It was also signed by counsel for: (1) the Debtor, (2) the U.S.

Trustee, (3) AT&T, (4) the unsecured creditors' committee, (5) JPMorgan Chase Bank and Chase Equipment Leasing, and (6) multiple school districts with claims against Debtor.

On July 27, 2008, the Court entered an Order Confirming Debtor's Second Amended Plan of Reorganization. The Confirmed Plan included the following provision regarding professional fees:

> Notwithstanding the foregoing, on or before July 31, 2008, the Debtor shall pay to McGuireWoods' client trust account the sum of $221,500.00. Such sum shall be applied against the allowed Professional Fees of McGuireWoods and SRR, and shall be shared Pro-Rata or as otherwise agreed, between McGuireWoods and SRR. To the extent that the allowed Professional Fees of McGuireWoods and /or SRR do not exceed the sum of $221,500.00, or to the extent that the Debtor has paid McGuireWoods and/or SRR more than the allowed amount of their Professional Fees, such excess monies shall be returned to the Debtor. Any remaining allowed Professional Fees of McGuireWoods and SRR shall be paid in six (6) equal monthly installments, commencing on September 30, 2008, and continuing on the last day of each month thereafter until paid in full, but in any event no later than February 28, 2009.

Confirmed Plan ¶ 2.2.

On August 25, 2008, the Committee filed its Final Application for Compensation and Reimbursement. The Committee sought fees in the amount of $239,859.00, and expenses in the amount of $7,383.92. The Application utilized project based billing, and divided services into twelve categories: (1) CMC Telecom, Inc. ($5,577.50), (2) Creditors Committee Meetings and Communications ($15,530), (3) Creditor's Inquiries and Correspondence ($477.50), (4) Petitions, Schedules, and Financial Reports ($ 10,097.50), (5) Cash Collateral and DIP Financing ($14,439), (6) Asset Sale(s)

10

($24,755), (7) Motions ($180), (8) Adversary Proceedings ($8,930), (9) Claims Administration ($165), (10) Investigation of Pre-Petition Transaction ($520), (11) Disclosure Statement and Reorganization ($126,120), and (12) Firm Retention and Fee Matters ($32,442.50).[6]   On August 25, 2008, SRR also filed its Final Application for Compensation and Reimbursement.  SRR sought fees in the amount of $177,640, and costs in the amount of $8,289.42.

On August 27, 2008, Counsel for Debtor filed its Second and Final Application for Compensation.  The Second Application sought fees for the period of January 1, 2008 through July 28, 2008 in the amount of $154,660.50 and expenses in the amount of $1,819.72.[7]  Debtor's Application sought approval of total fees in the amount of $272,085.25, and total expenses of $4,703.32.

Debtor and JPMorgan filed objections to the fee applications filed by the Committee and SRR.  The Committee filed objections to the fee application filed by Counsel for Debtor.  The objections to Debtor's Counsel's  fees and the fees of SRR were resolved consensually.  On October 15, 2008, the Court entered an Order awarding total fees to Debtor's Counsel in the amount of $254,336.87, and expenses in the amount of $4,703.32.  On November 25, 2008, the Court entered an Order awarding fees to SRR in the amount of $95,293.85.

---

[6]The total fees requested on the summary cover sheet of McGuireWoods Final Fee Application is $238,859.  The Court assumes that the $375 difference between the amount on the cover sheet and the total of the specific categories, $239,234, is an addition error.

[7]Debtor's Counsel's first fee application sought interim fees in the amount of $117,424.75, and expenses of $2,883.60 for the period of August 15, 2007 through December 31, 2007.  The first interim fee application was never approved.

McGuireWoods filed the present Final Application for Compensation and Reimbursement of Expenses on August 25, 2008. JPMorgan and Chase Equipment filed objections to the Application on September 11, 2008. Debtor filed objections to the Application on October 1, 2008.

JPMorgan and Chase Equipment object to the hourly rates charged by McGuireWoods' attorneys as excessive. They also contend that too much time was spent preparing a proposed plan which was not supported by creditors– secured or unsecured. The secured creditors contend that they were not even consulted regarding the Committee's Plan:

> Committee Counsel failed to discuss the Committee's proposed plan with the Bank or Leasing even though the votes of the Bank and Leasing Company in favor of the plan would have been required to confirm the plan. Instead, Committee Counsel proposed a plan that was guaranteed to elicit an objection from the Bank and Leasing. Committee Counsel's plan proposed to surcharge the Bank's claim in the amount of $100,000 'to fund the liquidation of Debtor's Assets and Debtor's causes of action' Committee Counsel provided no legal basis for the proposed surcharge...

(Chase Equipment Objections ¶ 11). Chase Equipment contends that all time spent on preparation of the Committee's Plan should be disallowed. Chase Equipment also objects to the amount of time spent reviewing and analyzing the Bank and Leasing Company's loan and lien documents (¶ 14, 15), excessive time spent drafting by-laws for the Committee, and time spent on the "sale process" or "developing 'sale strategies'". With respect to the sale process, Chase Equipment does not object to time spent on legal issues. Rather, it objects to time spent on sales activities which should have been handled by Stout Risius Ross, the Committee's financial advisor. (Chase Equipment Objections ¶ 16).

Debtor's objections to the Application are similar to the Chase Equipment objections.  Debtor objects to the hourly rates charged as excessive.  It also objects to the amount of time spent on a status conference (Debtor's Objections ¶ 3), all time spent on drafting a proposed Plan of reorganization which was unconfirmable on its face (Debtor's Objections ¶ 5), excessive time spent on adversary proceedings (Debtor's Objections ¶ 6), and time spent on marketing Debtor's assets (an activity which Debtor contends Counsel had no authority to conduct) (Debtor's Objections ¶ 4).

On October 9, 2008, Counsel filed a Reply to the objections filed by Debtor and Chase Equipment.  On October 28, 2008, the Court held a hearing on the Committee's fee application.

## Standard for Fee Awards in Bankruptcy

The court has a duty to review all fee applications, regardless of whether an objection has been filed, in order to protect the assets of the estate for the benefit of the creditors.  11 U.S.C. § 330(a)(2); *In re Bush*, 131 B.R. 364, 365 (Bankr. W.D. Mich. 1991).   A bankruptcy court has broad discretion in determining fee awards. *Manufacturers Nat'l Bank v. Auto Specialities Mfg. Co. (In re Auto Specialities Mfg. Co.)*, 18 F.3d 358 (6th Cir. 1994).  "The bankruptcy court must make an independent review of the fee petition. The court has the responsibility for avoiding waste of estate assets and preventing overreaching by attorneys in their attempts to be paid attorneys' fees from the estate."  *Solomon v. Wein* (*In re Huhn*), 145 B.R. 872, 875 (Bankr. E.D. Mich. 192)(citations omitted).  "An abuse of discretion occurs only when the bankruptcy court fails to apply the proper legal standard and procedure in making the fee determination or bases the award on clearly erroneous findings".  *Id.* (Citations omitted).

13

Section 330(a)(1) of the Bankruptcy Code provides that the court may award an

attorney reasonable compensation for actual, necessary services rendered. 11 U.S.C.

§ 330(a)(1). Section 330(a) provides, in pertinent part:

> (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103 --
>
> > (A) <u>reasonable compensation for actual, necessary services</u> rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any para-professional personal employed by any such person; and
> >
> > (B) reimbursement for actual, necessary expenses.
>
> (2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.
>
> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant facts, including
>
> > (A) the time spent on such services;
> >
> > (B) the rates charged for such services;
> >
> > (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> >
> > (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;
> >
> > (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy

14

field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for --

(I) unnecessary duplication of services; or

(ii) services that were not --

(I) reasonably likely to benefit the debtor's estate, or;
(II) necessary to the administration of the case.

11 U.S.C. § 330(a) (emphasis added).

To summarize,11 U.S.C. § 330(a) requires that requested fees must meet three conditions.  The fees must be: (1) reasonable; (2) incurred for services that were actually rendered; and (3) incurred for services that were necessary.  *In re Allied Computer Repair, Inc.*, 202 B.R. 877 (Bankr. W.D. Ky. 1996).

The Sixth Circuit has adopted a "lodestar method" for applying the requirements set forth in 11 U.S.C. § 330.  *In re Boddy,* 950 F.2d 334, 337 (6th Cir. 1991).  The lodestar method requires that the court first determine a reasonable hourly rate, and then multiply the rate times the reasonable number of hours expended to perform actual, necessary services.  The ability to review fee applications in the context of each individual case "permits the Court to balance the following two competing interests:  (1) rewarding the attorney [or other professional] practicing bankruptcy on a level commensurate with other areas of practice; against (2) the need to encourage cost-conscious administration."  *Allied Computer Repair, Inc.*, 202 B.R. at 884-85.  In *In re Atwell*, 148 B.R. 483, 490 (Bankr. W.D. Ky. 1993), the court stated,

In the real world, most law firms make adjustments to their bills to their nonbankrupt clients to eliminate unproductive time or to reduce hours on productive projects **where the total amount billed would be unreasonable in relation to the economic value of the matter in question**. As noted by the Supreme Court in *Hensley v. Eckerhort*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983):

> [attorneys] should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the private sector, "billing judgment" is an important component in fee setting. It is no less important here.' *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939 ("quoting Copeland v. Marshall, 641 F.2d 880 (D.C.Cir.1980)).

*In re Atwell*, 148 B.R. at 490 (emphasis added).

The burden of proof is upon the applicant to justify the requested fees.  *In re Hamilton Hardware Co., Inc.*, 11 B.R. 326 (Bankr. E.D. Mich. 1981).  "This burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by debtor."  *In re Pettibone Corp.*, 74 B.R. 293, 299 (Bankr. N.D. Ill. 1987)(citation omitted).  "While the burden is on the applicant to justify a fee request, the bankruptcy court must expressly discuss the amounts that are not supported by the application and provide a reasoning to support the court's decision." *In re Williams*, 357 B.R. 434, 439 (6th Cir. BAP 2007)(internal quotation marks and citation omitted).

With respect to determining what constitutes a reasonable hourly rate, the Sixth Circuit has stated:

> A major factor in determining what is a reasonable hourly rate for purposes of Lodestar is whether the rate charged is comparable to rates charged by comparable attorneys in the local area. *[In re] Associated Grocers [of Colorado, Inc.]*, 137 B.R. [413 (Bankr. D. Colo. 1990]] at 423. However, it is clear that in a case where the complexity, size and/or scope is sufficient to require the participation of counsel from various parts of the country, that

the comparison of hourly rates can be made on a national basis. Id. *See also In re Belknap*, 103 B.R. [842 (Bankr. W.D. Ky. 1989]; *In re Seneca Oil Co.*, 65 B.R. 902 (Bkrtcy.W.D.Okla.1986).

*In re Atwell*, 148 B.R. 483, 489 (Bankr. W.D. Ky. 1993).  *See also In re Atlas Automation, Inc.*, 27 B.R. 820 (Bankr. E.D. Mich. 1983).

### Analysis

After carefully reviewing the fee application filed by Counsel for the Committee, the Court finds that the objections of JPMorgan, Chase Equipment, and Debtor have merit.

As a preliminary matter, the Court must address Committee Counsel's hourly rate. JPMorgan, Chase Equipment and Debtor all objected to McGuireWoods' hourly rate. The majority of work in this case was performed by Ken Miskin at rates of either  $325 or $375 per hour, and David Swan, at rates of either $450 or $500 per hour.  While on the high side, those rates are not entirely unreasonable as compared to experienced local bankruptcy counsel.  Given that Counsel's rates are not significantly higher than local experienced committee counsel, the Court is overruling objections to the hourly rate. However, a high hourly rate carries with it a responsibility to be extremely efficient.  *See* e.g. *In re Kimber*, 2001 WL 1329226 (Bankr. D. Colo. 2001)("It is expected that attorneys with substantial expertise who charge a higher hourly rate will be more efficient than less experienced counsel.  It is also expected that every attorney, but especially one with substantial experience, will exercise billing judgment to assure that an appropriate fee is charged given the nature of the service, rather than presuming that a fee is reasonable simply by multiplying the rate charged by the individual who provided the service by the time spent." *Id.* at *6).

17

Before addressing the specific objections to McGuireWoods' Fee Application, the Court finds that the Fee Application as a whole demonstrates a lack of appropriate billing judgment. Counsel in this case was well aware of the fact that Debtor was administratively insolvent, yet, from the beginning, it billed an extraordinary number of hours given the size and complexity of the case. Counsel split its fee application into twelve separate billing categories, which allowed Counsel to bill for similar work in multiple categories. For example, Counsel billed for analyzing JPMorgan's liens both under "Creditor Committee Meeting and Communications" and under "Cash Collateral Issues". Given McGuireWoods' billing rate and experience, the relatively small amount of unsecured debt, and the Debtor's undisputed administrative insolvency, McGuireWoods billed too much time in this case. Had McGuireWoods been billing a private client with assets as limited as those of this Debtor's estate, much of the billing in multiple categories would have been eliminated as "non-billable". Similar billing judgment is required in the context of a bankruptcy proceeding. *In re Atwood*, 124 B.R. at 490.

The Court also finds merit in the specific objections made by JPMorgan, Chase Equipment, and Debtor. First, JPMorgan and Chase Equipment object to the fees sought by McGuire Woods for time spent analyzing JPMorgan's liens and cash collateral issues. The Court finds that time spent by the Committee for analyzing the cash collateral order is excessive. The Committee took no part in negotiating the original Cash Collateral Order and never raised any objections to the entry of the final Order. The Committee never contested the amount or validity of JPMorgan's liens. Nevertheless, McGuireWoods billed $14,439 for work performed relating to "Cash

18

Collateral and Financing", and billed small amounts under categories for issues related to the status of JPMorgan and Chase Leasing as secured creditors. The Court is reducing the fees billed in the category of Cash Collateral and DIP Financing by 50%, and awarding fees in the amount of $7,219.50.

The Court also agrees with the objections regarding the sale of Debtor's assets. At the hearing on the Committee's Application to Employ SRR, Debtor, JPMorgan, Chase Equipment, and the Court all expressed concerns about the additional costs to the estate of a financial advisor. Counsel for the Committee stated that with regards to sale issues Counsel would "take a back seat except for legal issues that pop up." (December 18, 2007 hearing Transcript at 20). Instead of taking a back seat on the sale issues, McGuireWoods appears to have been driving the car. In the category of fees related to "Asset Sales", McGuireWoods billed $24,755.00, primarily for conferences with SRR. After carefully reviewing Counsel's time records, it appears that only about 15% of the time billed for the sale of assets involved legal services. Counsel reviewed confidentiality agreements from a few prospective purchasers, and prepared for court hearings. However, Counsel did not perform any of the legal work typically performed when there is an asset sale: no time was billed for direct negotiations with purchasers, no asset purchase agreements were drafted, no motions regarding an auction or sale process were filed. It is clear that while SRR may have generated prospective purchasers, none of the prospective buyers was sufficiently qualified to move the sale process forward to the drafting of an asset purchase agreement. The Court finds that the vast majority of the time billed by McGuireWoods for work related to the asset sale was not legal work. Since SRR had been retained to market Debtor's assets and SRR

19

billed for those services, the additional work performed by Counsel was either duplicative or unnecessary. Certainly SRR is entitled to compensation for performing the services it was retained to perform, and had a purchaser generated enough revenue to fund a confirmable plan, both the efforts of SRR and the efforts of Counsel would have conferred a benefit on the estate. Since SRR's efforts failed to locate a qualified buyer, McGuireWoods was required to do minimal legal work with regard to the sale of Debtor's assets. The Court is cutting 85% of fees billed in the "Asset Sale" category.

JPMorgan, Chase Equipment, and Debtor raise their most serious objections in reference to the amount of time billed by McGuireWoods for "Disclosure Statement and Reorganization." McGuireWoods billed $126,120 for this category of services. The objecting parties argue that the Committee's Plan, which required $100,000 from an unconsenting secured creditor to fund the plan, was patently unconfirmable, and therefore, McGuireWoods should not be compensated for any time related to the Committee's Disclosure Statement and Plan.

On the facts of this case, the Court agrees with the objecting parties that the amount of time billed by McGuireWoods for drafting a plan so divorced from reality, is excessive. The Court recognizes that many proposed chapter 11 plans of reorganization do not initially meet the requirements of 11 U.S.C. § 1129. It is also true that the lawyers responsible for drafting a proposed plan that is ultimately not confirmed are, often, entitled to fees. An unsuccessful outcome does not necessarily eliminate the right to payment for the work performed.

> [C]ourts are to consider the necessity of the services at the time they were rendered, not at the time the court reviews the application. In order to benefit the estate, the services rendered must relate to a realistically

> obtainable goal.  Counsel for a debtor or debtor in possession will not be
> compensated for time spent in preparation of a plan which has no realistic
> hope of confirmation.

*In re Polishuk*, 258 B.R. 238, 248-49 (Bankr. N.D. Okla. 2001).  McGuireWoods' fees in

this case are excessive because it billed large sums of money in pursuit of a plan which

was patently unconfirmable.

Debtor's only significant creditors were AT&T, JPMorgan, and Chase Equipment.[8]

At the time Debtor filed for bankruptcy, AT&T filed claims in the amount of $3,853,54.40.

Debtor was involved in multiple lawsuits with AT&T.  Debtor owed JPMorgan and Chase

Equipment (combined) approximately $2,450,000 (secured).  Debtor had virtually no

operating cash.  It was clear from the beginning of the case that Debtor could not confirm

a plan without resolving its litigation with AT&T, restructuring its debt obligations to

AT&T, and honoring its secured obligations to JPMorgan and Chase Equipment.  The

only other alternative was for Debtor to sell its telecommunications business to a

purchaser acceptable to those creditors.

As discussed above, both Debtor and the Committee filed Combined Plans and

Disclosure Statements.  Neither plan was supported by enough creditors to be

confirmed:  AT&T and the Committee opposed Debtor's Plan, and JPMorgan and Chase

Equipment opposed the Committee's Plan. However, there was a key distinction

between the plans: Debtor's Plan was conceivably confirmable with the injection of

equity and/or a resolution of its issues with AT&T–conditions which were within the

---

[8]The Court does not mean to suggest that Debtor's other unsecured creditors are
unimportant-- only that in terms of dollar value, AT&T, JPMorgan, and Chase
Equipment are the most significant, and for purposes of restructuring, material creditors.

control of the proposing party, i.e. Debtor.  The Committee's Plan, on the other hand, was unconfirmable without a purchaser for Debtor's assets.  This condition, the finding of a purchaser with sufficient capital to satisfy the claims of  AT&T, JPMorgan, Chase Equipment, and generate a dividend to  unsecured creditors, was a condition completely outside the control of McGuireWoods.  Because a purchaser was a prerequisite to the Committee's Plan, it was futile to propose or pursue the Plan until a purchaser was found.  The distinction between Debtor's Plan and the Committee's Plan is that the Debtor's Plan could become confirmable; the Committee's Plan should never have been pursued absent a purchaser or the consent of the secured creditor to surcharge its collateral while  pursuing a purchaser.  Given Debtor's declining cash position, the Committee and AT&T's frustration is understandable.  But McGuireWoods' strategy of proposing a competing plan on these facts had no possibility of conferring a benefit to the estate.  The Court finds that McGuireWoods is not entitled to compensation in excess of $100,000 to pursue a strategy that could not succeed from the moment it was proposed.  *See e.g. In re Saturley*, 131 B.R. 509, 521 (Bankr. D. Me. 1991)("[F]utile efforts aimed at achieving unattainable objectives are unreasonable.  Fees generated in tilting at windmills will be disallowed"); *In re Polishuk*, 258 B.R. 238, 248–49 (Bankr. N.D. Ok. 2001)("In order to benefit the estate, the services rendered must relate to a realistically obtainable goal.  Counsel for a debtor or debtor in possession will not be compensated for time spent in preparation of a plan which has no realistic hope of confirmation").

While the Court finds that the fees billed by McGuireWoods for "Disclosure Statement and Reorganization" were excessive, the Court recognizes that some of the

22

fees are for services that are reasonable and necessary. McGuireWoods represented the unsecured creditors. In that capacity, it had an obligation to negotiate with Debtor and creditors, and devise a strategy that would produce the best result for unsecured creditors. The case law makes it clear, however, that competent representation includes the use of billing judgment. Billing judgment implies pursuing a realistic strategy, and keeping costs in line with benefits achieved.

In this case, McGuireWoods performed a valuable function. Its initial strategy of proposing to market Debtor's assets forced Debtor to negotiate with AT&T and JPMorgan, and ultimately to propose a confirmable plan. Debtor's confirmed Plan provides for payment in full to the unsecured creditors in equal monthly installments of principal and interest for a period of five years.[9] But, it is the *Debtor's* Plan that was confirmed, and it was confirmed because *Debtor* was able to negotiate a consensual resolution of its issues with AT&T, JPMorgan, Chase Equipment, and the Committee. Ultimately, payment to the unsecured creditors resulted from the efforts of Counsel for the Debtor, Chase, and AT&T, not through the efforts of Counsel for the Committee.

The Court finds that services performed by McGuireWoods in drafting and pursuing a plan which could not be confirmed were neither necessary, nor beneficial, to the estate. Therefore, the Court is reducing the amount billed by McGuireWoods in the category of "Disclosure Statement and Reorganization" by 50%.

## Conclusion

The objections of the parties opposing McGuireWoods' fee application are aimed

---

[9]The Plan provides that unsecured claims under $5,000 will be paid in full within 60 days of the effective date of the Plan. *See* Debtor's Second Amended Plan, ¶ 3.6.

23

at McGuireWoods' poor billing judgment, rather than specific time entries.  Courts are authorized to exercise their discretion to "determine whether a global reduction or enhancement of fees is in order."  *In re Atwell*, 148 B.R. 483.  For the reasons stated above, the Court finds that a global reduction of McGuireWoods' fees is appropriate. The Court is reducing the fees billed in the categories of "Cash Collateral and DIP Financing" and "Disclosure Statement and Reorganization" by 50%, and reducing the fees billed in the category of "Asset Sales" by 85%.  The total fees and expenses awarded are $155,296.67: fees in the amount of $ 147,912.75, and expenses in the amount of $7,383.92.


**Signed on April 06, 2009**

```
                        /s/ Marci B. McIvor
                      Marci B. McIvor
                      United States Bankruptcy Judge
```

24

07-56001-mbm    Doc 413    Filed 04/06/09    Entered 04/06/09 16:05:25    Page 24 of 24